UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ANTHONY JEROME MITCHELL,

      Plaintiff,

v.                           Case No. 1:16cv18-WTH-CJK

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

      Defendant.
_____/

REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to

28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A),

72.2(D), and 72.3, relating to review of administrative determinations under the

Social Security Act ("Act").  The case is now before the court pursuant to 42 U.S.C.

§ 405(g) for review of a final determination of the Commissioner of Social Security

("Commissioner") denying claimant's application for disability insurance benefits

("DIB") under Title II of the Act, 42 U.S.C. §§ 401-34.  Upon review of the record

_____

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Fed. R. Civ.
P. 25(d), Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin
as the defendant in this suit.

before the court, the undersigned concludes the matter should be remanded for further consideration consistent with the findings set forth herein.

## ISSUES ON REVIEW

Mr. Mitchell, who will be referred to as claimant, plaintiff, or by name, raises five issues on appeal. He claims: (1) "[t]he ALJ's conclusion that the record does not support a finding of fibromyalgia and therefore did not recognize it as a severe impediment is not supported by substantial evidence;" (2) "[t]he ALJ's limitations assessed as a result of the claimant's chronic fatigue syndrome is not supported by substantial evidence and he erred in requiring objective findings which are actually present in the record;" (3) "[t]he ALJ did not assess the effect of claimant's chronic pain pursuant to existing law and improperly evaluated the claimant's subjective complaints of pain;" (4) "[t]he ALJ failed to consider the combined effect of all of claimant's impairments in determining severity;" and (5) "[t]he ALJ erred in improperly relying on the opinion of non-examining physicians and failed to properly weigh the opinions of multiple treating physicians." Doc. 15, p. 13.

## PROCEDURAL HISTORY

On August 9, 2011, Mr. Mitchell filed an application for DIB, alleging disability beginning November 4, 2009. T. 360-61, 391. The application was denied initially on September 23, 2011, T. 183-87, and on reconsideration on October 25, 2011, T. 190-94. Mr. Mitchell requested a hearing, T. 195-99, which was held on

November 6, 2012, T. 210, 90-134.  In a decision dated January 22, 2013, the ALJ found Mr. Mitchell unable to perform any past relevant work but capable of sedentary work with additional restrictions.  T. 24, 156-75.  Mr. Mitchell requested review by the Appeals Council, which granted the request and remanded the case. T. 176.  Two additional hearings were held – on December 18, 2014, and July 2, 2015, resulting in an unfavorable decision dated July 21, 2015.  T. 14-44, 45-134. The ALJ found plaintiff not disabled and capable of sedentary, unskilled work with additional limitations.  T. 24-36.  Plaintiff sought review by the Appeals Council, which denied the request.  T. 1-6, 12.

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relevant to the issues raised in this appeal:

- "The claimant did not engage in substantial gainful activity during the period from his alleged onset date of November 4, 2009 through his date last insured of December 31, 2014 (20 CFR 404.1571 *et seq.*)."  T. 20.

- "Through the date last insured, the claimant had the following severe impairments: Degenerative disc disease of the cervical and lumbar spine, chronic fatigue syndrome (CFS), posttraumatic stress disorder (PTSD), obstructive sleep apnea on CPAP machine, and obesity. (20 CFR 404.1520(c))."  T. 20.

- "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." T. 22.

- "After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following limitations: the claimant is able to lift and carry 10 pounds occasionally and less than 10 pounds frequently." T. 24. "The claimant is able to stand and/or walk for 2 hours and sit for 6 hours in an 8-hour workday." T. 24. "The claimant would need a sit-stand option (i.e., the ability to stand for 5 minutes per hour at the workstation, but not necessarily consecutively)." T. 24. "The claimant is limited to occasional climbing of ramps and stairs and no claiming of ladders, ropes and scaffolds." T. 24. "The claimant is limited to no balancing and occasional stooping, kneeling, crouching, and crawling." T. 24. "The claimant is limited to occasional overhead reaching as well as frequent handling and fingering bilaterally." T. 24. "The claimant is limited to no concentrated exposure to extreme cold, heat, wetness/humidity, or vibrations." T. 24. "The claimant needs to avoid moving mechanical parts and unprotected heights." T. 24-25. "The claimant requires the use of a hand held assistive device to reach the workstation but does not require it at

the workstation." T. 25. "The claimant is limited to performing simple tasks with little variation that take a short period of time to learn (i.e., up to and including 30 days)." T. 25. "The claimant is able to deal with changes in a routine work setting." T. 25. "The claimant would relate adequately to supervisors and coworkers; however, the claimant is limited to occasional contact with the general public." T. 24-25.

- "Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565)." T. 34.

- "The claimant was born on October 3, 1966 and was 48 years old, which is defined as a younger individual age 45-49, on the date last insured. (20 CFR 404.1563)." T. 34.

- "The clamant has at least a high school education and is able to communicate in English (20 CFR 404.1564)." T. 34.

- "Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a))." T. 35.

- "The claimant was not under a disability, as defined in the Social Security Act, at any time from November 4, 2009, the alleged onset date, through December 31, 2014, the date last insured (20 CFR 404.1520(g))." T. 36.

STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also*

*Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)). A reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[2]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do his previous work, "but cannot, considering [his] age, education, and work experience, engage in any other

---

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in 5 steps:

1.     If the claimant is performing substantial gainful activity, he is not disabled.

2.     If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least 12 months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from performing his past relevant work, he is not disabled.[3]

5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national

---

[3] Claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

economy that accommodates the claimant's residual functional capacity and vocational factors, he is not disabled.

Step 5 (or step 4 in cases in which the ALJ decides a claimant can perform past work) is generally where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity. The ALJ establishes residual functional capacity, utilizing the impairments identified at step 2, by interpretation of (1) the medical evidence; and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step 5.[4] "[R]esidual functional capacity is the most [a claimant] can still do despite [claimant's] limitations.[5] 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Often, both

---

[4] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps." 20. C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[5] In addition to this rather terse definition of residual function capacity, the Regulations describe how the Commissioner makes the assessment:

(3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 416.912(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 416.912(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 416.913.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that

the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict and that conflict leads, as in this case, to the points raised on judicial review by the disappointed claimant.

FACT BACKGROUND AND MEDICAL HISTORY[6]

Mr. Mitchell was born on January 7, 1982, and was less than 50 years old at the time of the ALJ's decision.  T. 91.  He has a high school degree and worked in envelope manufacturing and as an industrial and military mechanic.[7]  T. 49, 167.  He alleges disability beginning November 4, 2009, due to fibromyalgia, chronic fatigue syndrome, post-traumatic stress disorder ("PTSD"), lower body weakness, nerve damage, gait and balance problems, and chronic pain.  T. 48, 395.  Mr. Mitchell's medical history, social history, and diagnoses are complex when compared to the broad range of claimants seeking redress in this court.

On November 4, 2009, Mr. Mitchell was admitted to a Department of Veterans Affairs ("V.A.") hospital for a C6/7 herniated spinal disk with

---

result from your symptoms, such as pain, provided by you, your family, neighbors, friends or other persons.  (See paragraph (e) of this section and § 416.929.)[.]

20 C.F.R. § 416.945(a)(3).

[6] The recitation of medical and historical facts of this case, as set out below, is based on the court's independent review of the record.  Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

[7] Mr. Mitchell was in the military from March 1985 through November 1993.  T. 49.

myelopathy.[8]  T. 508.  He underwent a cervical 6/7 anterior cervical diskectomy and fusion.  T. 508.  On December 7, 2009, he had elevated creatine phosphokinase[9] and weakness in his legs and knuckle pads, possibly stemming from a cervical lesion.  T. 510.  He also had foot pain, arthralgia of the knee, ulnar neuropathy, anemia, and hypertension.  T. 511.  His balance, however, improved with a cane.  T. 517.  He had been suffering from lower extremity weakness since 1996 and had bilateral knuckle pads on his hands since being discharged from the Army in 1993.  T. 529.

In January 2010, Mr. Mitchell had esophageal dysphagia with dysmotility and delayed esophageal clearance.  T. 541.  He also had uncontrolled hypertension and pain, numbness in his arms and fingers, and neuropathy.  T. 546, 548.  Treatment notes reflected a history of anxiety stemming from Desert Storm, for which plaintiff received PTSD treatment.  T. 549.  His symptoms included hyperarousal, suspiciousness, irritability, edginess, difficulty sleeping, depression, and flashbacks with panic symptoms, including palpitations.  T. 549-50.

---

[8] Myelopathy refers to "any functional disturbance or pathological change in the spinal cord; often used to denote nonspecific lesions, as opposed to myelitis."  http://medical-dictionary.thefreedictionary.com/myelopathy.

[9] Creatine is "a nonprotein nitrogen substance synthesized in the body from three amino acids: arginine, glycine (aminoacetic acid) and methionine. Creatine readily combines with phosphate to form phosphocreatine, or creatine phosphate, which is present in muscle, where it serves as the storage form of high-energy phosphate necessary for intense muscle contraction." http://medical-dictionary.thefreedictionary.com/creatine+phosphokinase.

In February 2010, Mr. Mitchell had nerve conduction studies of his left fingers because of "intense paresthesia;" they revealed abnormalities in both hands. T. 643-46. On June 16, 2010, he had right ulnar decompression surgery. T. 588-89. In October, Mr. Mitchell was involved in a drive-by shooting, which resulted in a left hand fracture and left flank wound. T. 586-87.

Mr. Mitchell visited Shands Hospital for post-surgical tingling in his left arm and leg problems on February 1, 2010. T. 683-85. He also was having problems with balance. On December 14, 2010, Dr. Fred Schert diagnosed severe fibromyalgia and severe chronic fatigue syndrome, stemming from Mr. Mitchell's military service. Dr. Schert said:

> [t]he veteran is obviously unemployable for even light muscular activities. His antalgic, unsteady gait prevents him from walking for more than 75 yards. He cannot stand for more than five minutes. He cannot climb stairs or ladders. He cannot stand in precarious places. Daytime hypersomnolence prevents even sedentary employment, such as clerical activities or watching TV security monitors and operating motor vehicles and mechanized equipment.

T. 896-98.

In March 2011, plaintiff reported burning in his legs and occasionally his hands. A note indicated he was exposed to toxins during Desert Storm. T. 687-89. He had another MRI of the cervical spine on April 5, 2011, which showed a loss of signal surrounding the spinal cord and slight deformation. T. 691. There also was

a loss of signal at C3-4 and evidence of degenerative disk disease, most significantly at C5-6.  The possibility of fibromyalgia was noted.  T. 692.

Claimant visited the neurological department of the University of Florida ("UF") in May and June 2011, reporting ongoing problems with low back pain and walking.  T. 694-702, 716.  According to Dr. Miller, one of his treating physicians, "[h]e remain[ed] unable to work and it [was] doubtful whether he w[ould] improve to the point that he w[ould] be able to work considering the symptoms and his other problems."  T. 702.  Mr. Mitchell had a 100% disability rating from the VA — 60% from chronic fatigue syndrome and 40% from fibromyalgia.+  T. 731.

During an evaluation at the UF Orthopedic and Sports Medicine Institute, plaintiff had a "markedly abnormal gait, especially with single-leg squat with decreased loss of balance and increased instability of the knees."  T. 827.  His chart reflected a history of anxiety, PTSD, high blood pressure, carpal tunnel syndrome, chronic fatigue syndrome, possible fibromyalgia, and gait disorder.  T. 825-30.  In the summer of 2011, he was diagnosed with fibromyalgia, pain disorder associated with psychological factors and general medical condition, and chronic PTSD.  T. 871.  His gait remained abnormal.  T. 874.

In early 2012, Mr. Mitchell visited the UF Physicians Neurology Group, which detected little change from his prior visit other than weight gain and right-sided radicular pain.  T. 2356-58.  He saw a neurosurgeon in September 2013, who

noted an MRI several months earlier showed bone marrow signal changes throughout the lumbar spine and referred him to hematology/oncology and for pain management. T. 649-52. A physical examination revealed "myelopathy demonstrated by hyperreflexia and positive Babinski's."[10] T. 2652.

During a follow-up visit on December 3, 2013, Hope Bishop, P.A., observed plaintiff continued to have pain; she also noted bone marrow changes, cervical radiculopathy, and that plaintiff continued to suffer from PTSD, headaches, fibromyalgia, depression, anxiety, hypertension, and now obesity. T. 2653. Mr. Mitchell said he felt he had left S1 radiculopathy and chronic left C8 radiculopathy. T. 2654. During another follow-up visit on January 28, 2014, the doctor documented problems with plaintiff's knee and gait and referenced possible rheumatological issues. T. 2656. A cervical MRI confirmed multilevel stenosis at C4-C7 with the most significant finding at C5-6 with moderate stenosis due to disk and facet arthropathy. The doctor stated additional surgical intervention of the cervical spine might be indicated but the "situation [was] complex." T. 2660-61.

---

[10] Babinski reflex is a "a reflex action of the toes, normal during infancy but abnormal after 12 to 18 months of age; after locomotion begins, it is indicative of abnormalities in the motor control pathways leading from the cerebral cortex and is widely used as a diagnostic aid in disorders of the central nervous system. It is elicited by a firm stimulus (usually scraping) on the sole of the foot, which results in dorsiflexion of the great toe and fanning of the smaller toes. Normally such a stimulus causes all the toes to bend downward." http://medical-dictionary.thefreedictionary.com/Babinski+reflex.

Plaintiff had another MRI of the lumbar and thoracic spine on June 3, 2014, which revealed broad-based disc bulges at L4-L5 and L5-S, as well as dessication of the L5-S1 disk with protrusion on the left side, causing narrowing of the neuroforamen and moderate facet osteoarthropathy at L4-L5 and L5-S1. T. 2664. In September 2014, plaintiff complained of abdominal pain; he had an ultrasound that confirmed chronic cholecystitis with an abnormal ejection fraction of his gall bladder, a "significant abnormality" according to the treating physician. T. 2672. V.A. records from October 2014 state "significant PTSD and has been complaining of epigastric and right upper quadrant pain on and off for over a year now." T. 2695. Records from January 23, 2015, note bilateral burning in his feet and lower legs and severe muscle spasms. T. 2791. Also in January 2015, plaintiff had an ENT procedure to address dysphagia, or difficulty swallowing. T. 2798-99.

With regard to his mental status, Mr. Mitchell suffered from situational-type phobias which, when combined with PTSD signs and symptoms, purportedly would "decrease work efficiency and ability to perform occupational tasks only during periods of significant stress." T. 907. The phobias were "different from PTSD in that panic attacks [were] unexpected and occur[ed] spontaneously." T. 908. "They [were] associated with symptoms of choking, numbness, tingling, difficulty breathing, heart racing and fear of losing control or dying and in this veteran's case chest pressure." T. 908. Mr. Mitchell also was diagnosed with panic disorder and

mood disorder and was noted to be socially isolated. T. 2154. He had a sleep disorder as well. T. 942.

Mr. Mitchell was first diagnosed with fibromyalgia in 2000, and treatment notes indicate his symptoms worsened with muscular activity and he could not bend, lift, or stoop and suffered from sleep disturbance, headaches, and paresthesis in his arms and legs. T. 2183. Muscle testing, which included both his upper and lower extremities, revealed 2/10 strength. T. 2183. He remained 40% disabled based on musculoskeletal pain and tender points, which apparently is the highest valuation for that condition. T. 2183.

Mr. Mitchell began psychotherapy at the Gainesville Vet Center in July 2009. T. 2181. He showed signs of chronic PTSD and depression, stemming largely from military service. T. 2181. His prognosis was guarded. T. 2181. On October 6, 2011, the VA found plaintiff 100% disabled as of October 28, 2010, from chronic fatigue syndrome. T. 2182. Psychiatric workups in November 2014 confirmed ongoing dysphoria, anhedonia, interrupted sleep patterns, secluded lifestyle, and limited activity due to chronic pain. T. 2849.

At the hearing, Mr. Mitchell testified he had not worked since November 4, 2009, and had past relevant work in envelope manufacturing, industrial mechanics, and military mechanics. T. 48-49. He said he continued to have problems with his neck after surgery, including headaches two or three times a day that lasted an hour

or longer.  T. 49-51.  He testified his hands cramped and he had problems with his shoulders that limited overhead lifting; he also said he was prone to falling.  T. 51, 58.  He described problems with his lower back and said the muscles in his legs tingled and burned, causing problems even while sitting.  T. 53.  He reported dermatomyositis and chronic fatigue.  T. 53.  He also said he used a cane that had been prescribed for walking and balancing.  T. 53-54.

He stated he could sit 25 to 40 minutes.  T. 55.  He quit taking narcotics after he became concerned about addiction; muscle relaxants "put[] him to sleep."  T. 56.  His daily activities were limited.  T. 57.  He had difficulty sleeping and took medication to help; he also used a CPAP machine.  T. 59.  He took Gabapentin, an anticonvulsant, which causes drowsiness and fatigue.  T. 62.

Mr. Mitchell testified about esophageal and stomach issues.  T. 63.  He said sitting was difficult because it caused his head to hurt worse.  T. 64.  He testified about PTSD symptoms, which included difficulty being in crowds and traffic, mood swings, and irritability.  T. 65-66.  He said he is tired all the time and has pain throughout his body.  T. 66.

When asked about his back and neck problems, Mr. Mitchell testified he had surgery on his neck, which had not healed.  T. 49.  He said he was "having problems between my C5, C6, and C7 region" that were "causing problems around in [his] chest a little bit, having headaches."  T. 50.  He then explained he was unsure how

to respond to the question because he was "going through confusion right now." T. 50. He continued "I'm having problems with my hands, but they're not saying that's coming from my neck." T. 50. When asked about his shoulders, Mr. Mitchell responded "Well, I'm going through pains with my joints and stuff but that's . . . separate from my neck." T. 50.

He said he had headaches "probably about two or three times a day" that lasted for "about an hour or two." T. 50-51. With regard to his hands, Mr. Mitchell said he had problems "probably about once or twice a day where [he] can't really touch stuff. T. 51. I mean, I touch it – my hands – I have to snatch my hands back. I have problems with my fingers. They're – they will start trying to cramp up on me. T. 51. "As far as my arms, I have the same problems with my biceps and forearms. When I try to move, everything wants to lock up. You know, I mean, I get where I can't move. T. 51. As for the shoulders, Mr. Mitchell explained "I'm going through a lot of joint pains." T. 52. His neck was "getting to where [he could] hardly move [his] throat, easily starting to get choked." T. 52. He was trying to make an appointment to have it checked "because [he] almost choked in [his] sleep about two or three – two or three times." T. 52. He "get[s] where [he] can't swallow or move [his] throat." The doctors, however, "said they didn't see anything." T. 52.

With regard to his lower back, plaintiff testified:

> they're telling me that I'm – I have a mild case of arthritis.
> I felt myself going out of work in 2009. And what I did

was I went to a lot of doctors. Even though I got a lot of no's, I kept on trying, you know, try to get somebody, because I didn't want to go out of work. And come to find out they're saying something now that something is going on with my very last two vertebraes [phonetic]. And they said it's very painful. It's hard for me to sit down. My muscles in my – well, my legs – they tingle real bad, like a real burning. You know, even sitting up – you know, I don't know if it's because of my back. They're saying it's dermatomyositis [phonetic] and the chronic fatigue. I can't hardly pick up my legs and walk. I'm having a very hard time. It's not every day, you know. But it's most of the days.

T. 52-53. He said he doesn't "do much walking. I would say probably about – I'm going to say 25 to 50 yards, because what I do is I had a hobby of working on cars, but it done got now to when I walk outside to one of my cars, I'm hurting so bad, I have to turn around and go back in, you know." T. 53. A doctor prescribed a cane, which he used for long-distance walking. T. 53.

Mr. Mitchell said he could stand in one place for 5 to 10 minutes, after which he had to sit down and rest. T. 53-54. He could sit down for about 25 to 40 minutes before needing to stand and stretch and estimated he could lift and carry about 50 pounds off the floor and 20 pounds off a table. T. 55. He explained pain medications "don't really work because it's mostly my nerves, you know. And then what's happening to me also is, like, I'm starting to have, like, separate muscles that burns or hurt real bad." T. 55. He continued, "[a]nd to think about it, since you said that, I had to have a — probably about four, five years ago, I had to have a surgery. And

I took some Percocets." T. 55-56.  Mr. Mitchell apparently feared he was becoming addicted and stopped the medication.  T. 55-56.  Other medication, particularly cyclobenzaprine, caused him to fall asleep.  T. 56.

When asked to explain a typical day, Mr. Mitchell testified that when he got up in the morning, he would take his daughter to her bus stop or to school, after which he would go to the store and get a cup of coffee.  T. 57.  He returned home between 10:00 and 12:00.  T. 57.  He took his medication and was "nonfunctional almost for the rest of the day till [his] wife [got] home."  T. 57.  "And they just put me on another drug that knocks me out no matter where I'm at."  T. 57.  As for household chores, "every now and then [he would] help [his] wife probably vacuuming, because [he had] a small living room, and probably – I sit on the toilet and wash out the tub."  T. 57.  He "clean[ed] the toilet every now and then."  T. 57.  When having a good day, he tried to do more."  T. 57.

The ALJ asked how many good days he had in a month, and plaintiff responded "[l]ately I've been doing a whole lot worser than I was.  Probably – this year I've probably had about a month of good days.  That's about it."  T. 57.  He nevertheless was able to drive because he had to "drive [his] baby to her bus stop."  T. 57.  He also drove to the store, to get coffee, and to appointments – as many as 4 a day.  T. 58.  When asked if he had problems getting dressed, Mr. Mitchell said he had trouble "picking [his] foot up in the bathtub."  T. 58.  The VA issued him a

shower chair.  T. 58.  He also tripped over rugs and took those up.  T. 58.  He said
he typically slept 3 to 5 hours a night and got "about an hour of sleep" during the
day – "probably about from 12:00 to 3:00 – because of his medication.  T. 59.

During the second hearing, Mr. Mitchell's counsel asked him to describe "the
symptoms and pain . . . from [his] neck."  T. 3077.  Mr. Mitchell testified he was
"having problems with [his] nerves."  T. 3077.  He explained that, "start[ing] from
the head down," he was "having problems with [his] – within [his] hand [he had] a
– [he] always ha[d] a tingling and a hurting in [his] hands and [his] fingers."  T.
3077.  He said he had four or five nerve conduction studies and was diagnosed with
carpal tunnel syndrome, for which there was no treatment.  T. 3078.  He said he took
Gabapentin but it did not relieve the numbness or tingling, although it lessened it
"[p]robably a little bit."  T. 3078.  Mr. Mitchell explained he could hold a glass of
water but he would have a "cramping problem.  It's like my body cramps up."  T.
3078.  He said he recently had been having two or three headaches a week that, at
least in one instance, lasted for a week and a half.  T. 3079.  Mr. Mitchell said he
took no medication for the headaches; he then testified he took Tramadol and other
medications, which knocked him out.  T. 3079.

The ALJ asked plaintiff about his ability to be around other people.  T. 3082.
Plaintiff responded "[i]f I take my medication I'm okay.  I'm okay.  It's just
frustrating."  T. 3082.  The ALJ then asked Mr. Mitchell what happened when he

was around crowds of people, such as in the grocery store. T. 3082. Mr. Mitchell said he did not hang around crowds and explained his "wife fusse[d] at [him] . . . because she [couldn't] get [him] to go where she want[ed] to go. And [he didn't] do crowds." T. 3082. He elaborated that, when around others, he was "always on guard" and "touchy," stemming from his time at "war," which still "put[] [him] in a different mood." T. 3083.

When asked about his cane, Mr. Mitchell said he used it "mostly when [he had] to walk a good little way" because he had a "balance impairment" and could not "walk straight . . . due to [his] gait and . . . weakness in [his] legs." T. 3083. When again describing his typical day, Mr. Mitchell initially said he got his "little girl" ready for school; he then said she got herself ready. T. 3084. He said he took her to school during the school year, approximately 8 miles away, and "a mile down the road" for volunteer work in the summer. T. 3084. When at home, he "tr[ied] to do what [he could]" and was frustrated because he was unable to work. T. 3085.

A vocational expert testified at each hearing. T. 68, 3086. At the first hearing, the vocational expert stated plaintiff had past relevant work as a panel machine operator, which is light and unskilled, and a maintenance machinist, which is medium and skilled. T. 68-69. The ALJ posed the following hypothetical:

> an individual with claimant's age, education, and past work as you've described; lifting and carrying weight at the light exertional level but limited to standing and walking for two hours in an eight-hour workday, sitting

for six; occasional climbing of ramps and stairs but no climbing of ladders, ropes, or scaffolds; and no balancing; occasional stooping, kneeling, crouching, and crawling. Overhead reaching would be limited to occasional; should have no concentrated exposure to vibration, work around moving mechanical parts, work at unprotected heights. From a mental standpoint, they would be limited to performing simple tasks with little variation that would take a short period of time to learn. That would be up to and including 30 days. Would be able to deal with the changes in a routine work setting. Would be limited to occasional general public and coworker contact, could relate adequately to supervisors. Would that individual be able to do the past work of the claimant?

T. 69. The vocational expert responded "No, your honor." T. 69. He then explained that such an individual would be able to perform the jobs of addresser, cutter and paster for press clippings, and waxer, all of which are sedentary and unskilled. T. 70.

As a second hypothetical, the ALJ asked the vocational expert to assume the same individual described above with the requirements of a handheld assistive device to reach, but not use at, the workstation. T. 70. The vocational expert testified the additional limitation would not affect the jobs cited. T. 70. For the third hypothetical, the ALJ asked the vocational expert to assume the individual described in the second hypothetical with the additional limitation that the individual would be expected to be off task approximately 20 percent of the workday at unpredictable intervals, which would fall outside the normally permitted breaks. T. 71. The vocational expert testified that such an individual would be unable to sustain

competitive employment at any exertional level.  T. 71.  Plaintiff's counsel inquired about an additional limitation of only occasional grasping, gripping, and fine manipulation of the bilateral hands, and the vocational expert responded the additional limitations would eliminate all three jobs.  T. 71-72.

The vocational expert who testified at the second hearing essentially agreed with the vocational expert who testified at the first hearing.  T. 3086-93.  Before the vocational expert testified, however, Dr. Richard Allen Hutson, a board certified orthopedic surgeon who was retained to review plaintiff's file, testified.  T. 3058. Dr. Hutson said he reviewed the medical exhibits up to the date last insured.  T. 3059.  Based on his review, Dr. Hutson concluded plaintiff had degenerative disc disease of the cervical and lumbar spine.  T. 3062-63.  In Dr. Hutson's opinion, Mr. Mitchell could lift 10 pounds occasionally and less than 10 pounds frequently and stand or walk 2 hours and sit 6 hours in an 8-hour work day.  T. 3064.  During the sitting portion of the work, according to Dr. Hutson, Mr. Mitchell "would need to have a sit-stand option and be allowed to stand for up to five minutes every hour, whether consecutive or not.  T. 3064.  He would need to be allowed to frequently leave the work station.  T. 3064.  He would not be able to climb ladders, ropes, or scaffolds and would need to avoid concentrated exposure to extreme cold or heat, wetness, humidity, and vibration.  T. 3064.  He would need to avoid heights,

hazardous areas, and moving machinery. T. 3064. "That would be all," in Dr. Hutson's opinion. T. 3064.

In response to questioning by claimant's counsel, Dr. Hutson acknowledged he was not aware of the nature and extent of Mr. Mitchell's pain and it was possible Mr. Mitchell had a herniated disc, which can produce symptoms in the arms and hands. T. 3066-67. Dr. Hutson testified there would be no way to judge the nature or extent of Mr. Mitchell's pain because "[p]ain is totally subjective." T. 3068. With regard to Dr. Schert's opinion plaintiff could not perform even light muscular activities, Dr. Hutson found no "clinical, medical evidence in the record to back up that severe" a limitation. T. 3070. Plaintiff's counsel questioned Dr. Hutson about Dr. Miller's opinion claimant was unable to work, with which Dr. Hutson disagreed, finding Mr. Mitchell capable of sedentary work. T. 3071.

Following up on plaintiff's counsel's questioning, the ALJ mentioned fibromyalgia and asked Dr. Hutson if he was familiar with the applicable Social Security ruling. T. 3073. Dr. Hutson testified he was and recited the criteria for a finding of a medically determinable impairment based on fribromyalgia, including trigger points. T. 3073-74. He then said "[f]ibromyalgia's . . . supposed to be totally disabling for a period of time," which "is not in this record." T. 3073. Dr. Hutson testified he saw no evidence in the record of a trigger point count, the lack of which was conceded by plaintiff's counsel, as was the requirement of a certain number of

trigger points in order for fibromyalgia to constitute a medically determinable

impairment and the ALJ's inability to consider limitations from an impairment that

was not medically determinable.  T. 3074.

Following Dr. Hutson's testimony, the ALJ posed the following hypothetical,

asking the vocational expert to assume an individual

> limited to the – essentially a sedentary lifting and carrying
> with 10 pounds occasionally and less than 10 pounds
> frequently.  The two hours standing and walking with the
> six hours sitting.  There's – I think he gave a five minute
> per hour sit/stand option.  Five minutes at the workstation
> and not necessarily consecutive.  Occasional climbing of
> ramps and stairs.  I would indicate, however, no climbing
> of ladders, ropes, or scaffolds.   And  no balancing.
> Occasional stooping, kneeling, crouching, and crawling.
> Could – limit overhead reaching to occasional.  Handling
> and fingering would be frequent.  Do that on both sides I
> believe.  No concentrated exposure to extremes of believe
> it was heat or cold, wetness, and humidity, vibration.  And
> I think it was none for moving mechanical parts, work at
> unprotected heights.  From a – I guess I still will include
> requiring the use of a hand held assistive device to reach
> the workstation but would not require that while they were
> at the workstation.  And from a mental standpoint would
> be limited to performing simple tasks with little variation
> that takes a short period of time to learn.  That would be
> up to and including 30 days.  Also would be able to deal
> with the changes in a routine work setting.  From a social
> standpoint they would relate adequately to supervisors and
> co-workers.  We could limit the general public contact to
> be occasional.  Think it's pretty clear would be able to do
> the past work of the claimant.

T. 3087-88.  The vocational expert testified that such an individual, with a high

school education and Mr. Mitchell's training, could be a surveillance system

monitor, addresser, and "loader, semiconductor dies," all of which are sedentary.  T.

3089-90.

As a second hypothetical, the ALJ posed the following:

> the individual from the first and add that as we've heard
> described they would be off task during the working
> estimated at about 20 percent of the workday.  And that'll
> be at of course unpredictable intervals.  So that would fall
> outside the normally permitted breaks which I understand
> to be the two 15 minute breaks and one 30 minute break.

T. 3090.  The vocational expert testified such an individual "would not be able to

maintain consistent or continued employment."  T. 3090.  He also testified, with

regard to absenteeism, that "[a]fter you've exhausted any approved time and you

take it as you accrue it twice a month would preclude work."  T. 3090.

Claimant's counsel asked the vocational expert to impose the additional

limitation of jobs with little to no stress, meaning no production quotas or expected

response times, no working with the public, and only occasional contact with

coworkers and supervisors, as well as only occasional grasping, fingering, feeling,

and fine manipulation of the bilateral hands.  T. 3091-92.  Such an individual,

according to the vocational expert, could be a surveillance system monitor unless he

would be off task 20 percent or more of the time, in which case he would be

unemployable.  T. 3092.

On remand from the Appeals Council, the ALJ found claimant had not

engaged in substantial gainful activity during the period of his alleged onset date of

November 4, 2009, through his date last insured of December 31, 2014.[11]  T. 20.  He determined claimant had the following severe impairments: degenerative disk disease of the cervical and lumbar spine, chronic fatigue syndrome, PTSD, obstructive sleep apnea on CPAP machine, and obesity.  T. 20.  He also found claimant had not presented evidence sufficient to establish that fibromyalgia was a medically determinable impairment pursuant to Social Security Ruling 12-2p and that Mr. Mitchell did not have an impairment or combination of impairments that met or equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  T. 21-24.

---

[11] The Appeals Council instructed the AJL on remand to give further consideration to the nature, severity, and limiting effects of plaintiff's fibromyalgia and CFS and obtain evidence from a rheumatological, neurological, or orthopedic medical expert to clarify the nature, severity, and limiting effects of claimant's combination of impairments.  T. 17.  The Appeals Council advised the ALJ could "request the claimant's examining and treating sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments."  T. 17.  The ALJ also was to give further consideration to Mr. Mitchell's "maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations."  T. 17.  The Appeals Council specified that "non-specific terms such as 'low,' 'moderate,' and 'stress' should not be used to describe the extent of the claimant's functional limitations" and that the ALJ should "evaluate all medical opinions, and explain the weight given to such opinion evidence."  T. 17.  The Appeals Council further instructed the ALJ to "obtain a copy of the entire [VA] Rating Decision, dated October 6, 2011, and determine the weight to be given this evidence."  T. 17-18.  Finally, if warranted, the ALJ was to "obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base" and pose hypothetical questions that would "reflect the specific capacity/limitations established by the record as a whole."  T. 18.  The ALJ was to "ask the vocational expert to identify examples of appropriate jobs and state the incidence of such jobs in the national economy" and, before relying on the vocational expert evidence . . . identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p)."  T. 18.

The ALJ found Mr. Mitchell had the residual functional capacity to perform sedentary work as defined in 20 CFR § 404.1567(a) with additional limitations of lifting and carrying 10 pounds occasionally and less than 10 pounds frequently, standing or walking 2 hours and sitting 6 hours in an 8-hour workday, the need for a sit/stand option, and only occasional climbing of ramps and stairs. T. 24-25. He found claimant could not climb ladders, ropes, or scaffolds; could not balance; and could only occasionally stoop, kneel, crouch, and crawl. T. 24. He found Mr. Mitchell limited to occasional overhead reaching but capable of frequent handling and fingering bilaterally. T. 24. He could have no concentrated exposure to extreme cold, heat, wetness, humidity, or vibrations. T. 24. He needed to avoid moving mechanical parts and unprotected heights, and he required use of a handheld assistive device to reach a work station. T. 24-25. Finally, the ALJ found plaintiff could perform simple tasks with little variation and was limited to occasional contact with the general public; he could deal with routine changes in the work setting, however, and relate adequately to supervisors and co-workers. T. 25.

In reaching his conclusions, the ALJ gave little weight to the opinion of Dr. Schert, a treating physician, that claimant is "obviously unemployable for even light muscular activities" and the opinion of Dr. Miller, another treating physician, that plaintiff remains unable to work. T. 27-29. The ALJ gave greater weight to the opinion of Dr. Hutson, the non-examining, non-treating physician who testified at

the second hearing.  T. 27.  He did not accord "any significant weight" to Mr. Mitchell's VA disability rating.  T. 27.  The ALJ noted the opinion of Dr. Kaplan that claimant has "significant neuropathic pain in his arms and legs" and is incapacitated by his pain, but he gave it little weight finding "the medical evidence of record does not contain the type of significant clinical and laboratory abnormalities one would expect if the claimant was in fact disabled."  T. 33.  The ALJ gave some weight to state agency physicians who reviewed the record in 2011.  T. 34.  The ALJ ultimately concluded, based in part on the testimony of the vocational expert, that there were sedentary, unskilled jobs claimant could perform.  T. 35.

ANALYSIS

1.   Fibromyalgia

Mr. Mitchell first claims "[t]he ALJ's conclusion that the record does not support a finding of fibromyalgia and therefore did not recognize it as a severe impediment is not supported by substantial evidence."  Mr. Mitchell argues the ALJ should have found fibromyalgia to be a severe impairment because he was diagnosed with the condition, was found 100% disabled by the VA due to fibromyalgia, had pain in all quadrants of his body, and was diagnosed with CFS, a sleep disorder, anxiety, and depression.

Claimant bears the burden of proving he has a severe impairment. *See Bowen v. Yuckert*, 482 U.S. 137, 111, 146 n.5 (1987). An impairment is severe if it significantly affects a claimant's ability to perform work-related activities, regardless of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a); *Bridges v. Bowen*, 815 F.2d 622, 625 (11th Cir. 1987). Work-related activities include physical functions such as standing, walking, lifting, and sitting. *See* 20 C.F.R. § 404.1521(b).

In considering whether fibromyalgia constituted a severe impairment, the ALJ noted there were "references to fibromyalgia in the medical evidence of record." T. 20. Specifically, the ALJ noted Mr. Mitchell reported the onset of symptoms of fibromyalgia in 1989, which allegedly worsened after his return from Southwest Asia in 1991, and was diagnosed with fibromyalgia in 2000. T. 20. Mr. Mitchell also reported symptoms of fibromyalgia that rendered him unable to perform even light housework. T. 20-21. As the ALJ observed, however, Mr. Mitchell was able to engage in substantial gainful activity until 2009 despite the alleged disabling symptoms. T. 21. *See* 20 C.F.R. § 404.1520(a)(4)(i) ("If you are doing substantial gainful activity, we will find that you are not disabled.").

In determining fibromyalgia was not a severe impairment, the ALJ considered Social Security Ruling (SSR) 12-2p (Evaluation of Fibromyalgia), which explains that for fibromyalgia to constitute a medically determinable impairment, a

claimant must show a history of widespread pain; either 11 or more positive tender points or repeated manifestations of 6 or more fibromyalgia signs, symptoms, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems, waking un-refreshed, depression, anxiety disorder, or irritable bowel syndrome; and evidence that other disorders that could cause the signs or symptoms were excluded. T. 21-22. The ALJ also recounted the testimony of Dr. Hutson that plaintiff satisfied none of the conditions set forth in SSR 12-2p – i.e., there was no trigger point testing, no evidence that other disorders that could cause plaintiff's symptoms had been ruled out, and no evidence of musculoskeletal pain in all quadrants of Mr. Mitchell's body. T. 21-22, 73.

The fact plaintiff may have been diagnosed with fibromyalgia and other conditions does not render the ALJ's finding erroneous. Indeed, the Eleventh Circuit has held that a diagnosis alone is an insufficient basis upon which to find disability when there is no indication of severity. *See Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987); *see also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (noting "the mere diagnosis of arthritis, of course, says nothing about the severity of the condition").

The ALJ, however, did not provide a sufficient basis upon which to give the VA rating less than great weight. Although not binding, *see* 20 C.F.R. § 404.1504, a disability rating by the VA is entitled to great weight; a failure to consider it

constitutes error.[12] *Falcon v. Heckler*, 732 F.2d 827 (11th Cir. 1984) (holding that because Florida workers compensation disability law and Social Security disability law operate similarly, the ALJ must give great weight to a workers compensation decision); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1241 (11th Cir. 1983) (holding that "findings of disability by another agency, although not binding on the [Commissioner], are entitled to great weight."); *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. Unit A, March 25, 1981) (holding that "a V[eterans] A[dministration] rating is certainly not binding on the [Commissioner], but it is evidence that should be considered and is entitled to great weight . . . and [in this case] should have been more closely scrutinized."); *DePaepe v. Richardson*, 464 F.2d 92 (5th Cir. 1972); *Hogard v. Sullivan*, 733 F. Supp. 1465 (M.D. Fla. 1990).

Here, the ALJ considered the VA rating, but he did not afford it great weight, noting the rating includes factors not germane to the issue of disability under the Social Security Act. T. 27. The ALJ also noted he "is not bound by the decision of another governmental or non-governmental agency" and that, "while the clinical findings reported by the VA medical staff were given appropriate weight, the final opinion as to degree of disability is not entitled to any significant weight." T. 27.

---

[12] The Regulations were amended to provide that "in claims filed (see § 404.614) on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled . . . or entitled to any benefits." 20 C.F.R. § 404.1504.

As the Eleventh Circuit has observed, "it is the law of this Circuit that '[a]lthough the V.A.'s disability rating is not binding on the [SSA], it is evidence that should be given great weight.'" *Brown-Gaudet-Evans v. Comm'r of Soc. Sec.*, 673 F. App'x 902, 904 (11th Cir. 2016) (*quoting Brady v. Heckler*, 724 F.2d 914, 921 (11th Cir. 1984) (per curiam) (quotation omitted)). "It is not disputed that the VA's 'disability' determination relies on different criteria than the SSA's determination. But that does not mean that the ALJ can summarily ignore the VA's determination nor give it 'little weight.'" *Brown-Gaudet-Evans*, 714 F. App'x at 904. Because the ALJ failed to provide an adequate basis upon which to discount the VA disability rating, including addressing any discrepancies between the VA rating and clinical findings, the matter must be remanded for further consideration of the rating and/or explanation for not giving it great weight.

As in *Brown-Gaudet-Evans*, "[o]n remand, the ALJ is not required to give the VA's disability determination controlling weight. In making his own determination of whether [plaintiff] is disabled, however, the ALJ must seriously consider and closely scrutinize the VA's disability determination and must give specific reasons if the ALJ discounts that determination." *Id.*

2.    Chronic Fatigue Syndrome

Mr. Mitchell next claims the ALJ failed to properly assign limitations based on Chronic Fatigue Syndrome ("CFS") and erred in requiring objective findings of

such. According to SSR 14-1p, the Commissioner must adjudicate claims involving CFS as it does any other impairment; thus, once the ALJ determines CFS is a severe impairment, he should assess the severity of the claimant's symptoms by considering the medical signs, symptoms, and laboratory findings, as well as the claimant's subjective complaints. When assessing the impact of Mr. Mitchell's CFS, the ALJ considered the supposed symptoms of the condition, as set forth in at SSR 14-1p: palpably swollen or tender lymph nodes, nonexudative pharyngitis, and persistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points. T. 28. *See* SSR 14-1p, 2014 WL 1371245, at *4. The ALJ found no evidence of tender lymph nodes or nonexudative pharyngitis. T. 28, 897. He noted normal muscle tone, no muscle atrophy, and 5/5 muscle strength. T. 29, 923-24, 1010, 1024, 1028, 1151, 1242-43, 1264, 1278, 1341, 1387, 1429, 1462, 1485-86. Although there was an indication of severe muscle aches and weakness, the ALJ found "this statement appears to be based on the claimant's subjective report of his symptoms and limitations." T. 29. The ALJ further observed it was "reasonable to assume that an individual with severe muscle aches and weakness and/or chronic fatigue syndrome, who must lie down most of the day (as alleged), would experience physical deconditioning due to inactivity. However, the objective medical evidence does not support physical deconditioning." T. 29. Moreover, reports of muscle weakness were inconsistent. T. 29, 956, 967, 1051, 1090, 1245,

1268, 1431, 1433. And medication improved plaintiff's musculoskeletal pain and gait difficulties. T. 29, 699. *See* 20 C.F.R. § 404.1529(c)(3)(iv); *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984); *see also Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").

Based on the record as a whole, the ALJ identified CFS as a severe impairment but gave little weight to Dr. Schert's opinion that Mr. Mitchell was unemployable as a result of it, because he found the opinion unsupported by the evidence of record. T. 20, 27, 29. As an example, the ALJ noted that in February 2010, Mr. Mitchell "presented to the Neurology Clinic at Shands with complaints [of] gait and balance problems; however, on examination, the clinical findings were 'relatively mild.'" T. 29. The ALJ continued, "[t]reatment notes dated June 2011 indicate that Lyrica significantly decreased his muscular skeletal pain and gait difficulty" and "claimant did well with balance training . . . and . . . was encouraged to continue with his balance and gait training exercises independently." T. 29. Contrary to plaintiff's premise, therefore, the ALJ acknowledged limitations caused by CFS, but articulated good cause for his decision the condition did not render plaintiff unemployable. T. 24-25. *See Crawford*, 363 F.3d at 1159-60 (finding good cause for discounting a treating source's opinion when it was inconsistent with the medical source's own treatment notes, unsupported by the medical evidence, and based primarily on the

plaintiff's subjective complaints). Plaintiff therefore has failed to show error with regard to the ALJ's findings pertaining to CFS. *See* SSR 14-1p, 2014 WL 1371245, at *4, 8-9.

3. Pain/Credibility Determination

Claimant's third assignment of error argues the ALJ did not properly assess his chronic pain. Pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, "unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929. The Eleventh Circuit has articulated the 3-part pain standard, sometimes referred to as the *Hand*[13] test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (*citing Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)); *see Adamo v. Comm'r of Social Sec.*, 365 F. App'x 209, 2010 WL 476691, *3 (11th Cir. 2010) (*quoting Wilson*) (Table, text in

---

[13] *Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir. 1986) (the case originally adopting the three-part pain standard).

WESTLAW); *Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991). The Eleventh Circuit also has approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529 because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." *Wilson*, *supra*, 284 F.3d at 1226.

Notably, "[w]hile both the Regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." *Elam*, 921 F.2d at 1215. The Eleventh Circuit has recognized that "pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (*citing Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)); *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987); *Hurley v. Barnhart*, 385 F. Supp. 2d 1245, 1259 (M.D. Fla. 2005). However, the presence or absence of evidence to support symptoms of the severity claimed is a factor that can be considered. *Marbury*, 957 at 839-40; *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, the Commissioner's refusal to credit plaintiff's subjective testimony regarding pain must be explicit, and the ALJ must provide reasons for the decision in that regard. *MacGregor v. Bowen*, 786 F.2d at 1054. Although the Eleventh Circuit does not require an explicit finding as to a claimant's credibility, the

implication must be obvious to the reviewing court. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The credibility determination does not need to cite particular phrases or formulations, but it cannot merely be a broad rejection, which is not enough to enable the reviewing court to conclude the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210 (11th Cir. 2005) (internal quotations and citations omitted). And, of course, the reasons articulated for disregarding the plaintiff's subjective pain testimony must be based on substantial evidence. *Wilson*, 284 F.3d at 1225-26; *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley*, 385 F. Supp. 2d at 1259.

Underlying the *Hand* standard is the need for a credibility determination concerning a plaintiff's complaints of pain. Those complaints, after all, are subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints"). People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the

[Commissioner], is subject only to limited review in the courts . . . ." *Hand*, *supra*, at 1548-49.

It is within the ALJ's "realm of judging" to determine whether "the quantum of pain [a claimant] allege[s] [is] credible when considered in the light of other evidence." *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984). Hence, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that. *See id.* The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination. *See id.*

The ALJ determined Mr. Mitchell's medically determinable impairments could reasonably be expected to cause his alleged symptoms; the ALJ also determined, however, that Mr. Mitchell's statements as to the intensity, persistence, and limiting effects of his symptoms were not entirely credible. T. 25, 30. The ALJ cited several inconsistencies in Mr. Mitchell's statements concerning his symptoms, including that Mr. Mitchell alleged debilitating headaches between 2 and 3 times a week and as frequently as 2 or 3 times a day, lasting as long as a week, but repeatedly denied headaches to his medical providers. T. 30, 50-51, 3079. *See* 20 C.F.R. § 404.1529(c)(4). Mr. Mitchell also acknowledged medication helped control his headaches. T. 30. *See* 20 C.F.R. § 404.1529(c)(3)(iv); *Harwell v. Heckler*, 735 F.2d

1292, 1293 (11th Cir. 1984). Mr. Mitchell reported disabling symptoms associated with his gallbladder and polymyositis (an inflammatory disease that causes muscle weakness), but the ALJ noted he was noncompliant with his prescribed diet. T. 30-31. *See Ellison*, 355 F.3d at 1275 (holding that a plaintiff's noncompliance with prescribed treatment may be used as a factor for discounting allegations of disability). The ALJ found other record evidence, including plaintiff's daily activities (such as working on cars, driving his daughter to school, and household chores), inconsistent with his complaints of disabling symptoms. T. 30-33. *See* 20 C.F.R. § 404.1529(c)(3)(i); SSR 96-7p, 1996 WL 374186 at *3, 6, 7 (S.S.A.); *see also Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987); *Harwell*, 735 F.2d at 1293. Considering the ALJ gave specific examples to support his decision regarding plaintiff's credibility and Mr. Mitchell has not challenged the ALJ''s findings in that regard, the undersigned finds substantial evidence supports the ALJ's credibility determination. *See Foote*, 67 F.3d at 1562; *see also Allen v. Sullivan*, 880 F.2d 1200, 1203 (11th Cir. 1986) (finding the ALJ properly discredited the claimant's subjective complaints of pain when he articulated at least 3 reasons for rejecting them); *MacGregor v. Bowen*, F.2d 1050, 1054 (11th Cir. 1986).

4.      Combined Effect of Impairments

As his fourth assignment of error, plaintiff argues the ALJ failed to consider the combined effect of his impairments when determining severity. "Where a

disability claimant has alleged several severe impairments, the Secretary has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled." *Jones v. Dep't of Health and Human Servs.*, 941 F. 2d at 1533; *see also Jones v. Bowen* 810 F. 2d 1001, 1006 (11th Cir. 1986) ("It is now well settled that the ALJ must consider the combined effects of a claimant's impairments in determining whether he is disabled."). As applied by the Eleventh Circuit, this rule requires the ALJ to "consider every impairment alleged." *Gibson v. Heckler*, 779 F. 2d. 619, 623 (11th Cir. 1986). A statement by the ALJ that "'based upon a thorough consideration of all evidence, the ALJ concludes that [claimant] is not suffering from any impairment, *or a combination of impairments* of sufficient severity to prevent him from engaging in any substantial gainful activity for a period of at least twelve continuous months[,]" will suffice to demonstrate the ALJ "has considered the combination issue." *Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986). The ALJ, however, maintains the duty to make "findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled." *Bowen v. Heckler*, 748 F. 2d 629, 635 (11th Cir. 1984); *see also Walker v. Bowen*, 826 F. 2d 996 (11th Cir. 1987).

Here, the ALJ stated that "[t[hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P,

Appendix 1." T. 22. Although such statement may have been adequate had the ALJ properly considered and weighed all the evidence of record, that is not the case here. On remand, therefore, the ALJ should reconsider the combined effect of plaintiff's impairments in light of the additional findings regarding the VA rating.

5. Treating Physician

Finally, Mr. Mitchell asserts "[t]he ALJ erred in improperly relying on the opinion of non-examining physicians and failed to properly weigh the opinions of multiple treating physicians." Doc. 15, p. 13. The opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner unless the Commissioner has good cause to not accord considerable or substantial weight. *See Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-61 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). "Good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips*, 357 F.3d at 1241; *see also Lewis*, 125 F.3d at 1440.

The ALJ must give a treating physician's opinion controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20

C.F.R. §§ 404. 1527(d)(2), 416.927(c)(2). Where a treating physician has merely made conclusory statements, however, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must weigh the medical opinion based on (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) its inconsistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion. 20. C.F.R. §§ 404.1527(d), 416.927(c)(2). "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate [his] reasons." *Phillips*, 357 F.3d at 1241. Failure to do so is reversible error. *Lewis*, 125 F.3d at 1440 (*citing MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)); *see also Nyberg v. Comm'r of Soc. Sec.*, 179 F. App'x 589, 591 (11th Cir. 2006).

As set forth above, the ALJ gave little weight to the opinion of Dr. Schert, a treating physician, that claimant is "obviously unemployable for even light muscular activities" and the opinion of Dr. Miller, another treating physician, that plaintiff remains unable to work. He noted the opinion of Dr. Kaplan that claimant has

"significant neuropathic pain in his arms and legs" and is incapacitated by his pain, but he gave it little weight finding "the medical evidence of record does not contain the type of significant clinical and laboratory abnormalities one would expect if the claimant was in fact disabled." T. 33. The ALJ gave some weight to State Agency physicians who reviewed the record in 2011. T. 34. The ALJ gave greater weight to the opinion of Dr. Hutson, the non-examining, non-treating orthopedic surgeon who testified at the second hearing.[14] The ALJ did not accord "any significant weight" to Mr. Mitchell's VA disability rating. T. 27.

In giving little weight to Dr. Schert's opinion, the ALJ noted Dr. Schert found no indication of tender lymph nodes or non-exudative pharyngitis, as required to

---

[14] As recognized in the regulations, state agency medical and psychological consultants are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." *See* 20 C.F.R. § 404.1527(e)(2)(I). Under the applicable law, an ALJ may rely upon, and must consider, the opinions of state agency consultants. *See* 20 C.F.R. § 404.1527(e)(2); *see also Voronova v. Astrue*, 2012 WL 2384414, *4 (M.D. Fla. 2012) (acknowledging that ALJ is required to consider opinions of non-examining state agency medical and psychological consultants). Specifically, although not bound by such opinions, the ALJ "must consider findings and other opinions of state agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether [claimant is] disabled. . . ." 20 C.F.R. § 404.1527(e)(2)(I). When considering the findings of a state agency medical or psychological consultant, the ALJ will look to factors "such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii). The ALJ determines the weight afforded to consultants and, if the ALJ affords controlling weight to such a consultant, rather than to a treating source, the ALJ must explain the weight given to the opinion, just as with other medical sources. *Id.; see Milner v. Barnhard*, 275 F. App'x. 947, 948 (11th Cir. 2008) (holding that, in a proper case, the ALJ does not err by giving substantial weight to the opinions of non-examining physicians, including state agency medical and psychological consultants).

show CFS. T. 29, 897-98. *See* SSR 14-1p, 2014 WL 1371245, at *4. The ALJ found Dr. Schert's observation of severe muscle aches and weakness inconsistent and unsupported by the record. T. 29, 923-24, 956, 967, 1010, 1024, 1028, 1051, 1090, 1151, 1242-43, 1245, 1264, 1268, 1278, 1341, 1387, 1429, 1431, 1433, 1462, 1485-86. In fact, Mr. Mitchell denied muscle weakness on multiple occasions. T. 29, 956, 1090, 1245, 1268, 1431, 1433. *See Crawford*, 363 F.3d at 1159-60 (finding good cause for discounting a treating source's opinion when it was inconsistent with the medical source's own treatment notes, unsupported by the medical evidence, and based primarily on the plaintiff's subjective complaints). The ALJ found Dr. Miller's opinion to be based on plaintiff's cervical spine impairment, which was not a disabling limitation. T. 26-28. *See Phillips*, 357 F.3d at 1241. The ALJ found Dr. Kaplan's finding of significant, incapacitating neuropathic pain" in claimant's arms and legs unsupported by Dr. Kaplan's own examination and based on plaintiff's subjective complaints. T. 33, 3047. *See Crawford*, 363 F.3d at 1159-60. Curiously, Dr. Kaplan indicated that multiple examinations had not produced any positive results, a physical exam showed excellent strength throughout, and there was no compression in plaintiff's lumbar spine requiring surgical intervention. T. 3047. The plaintiff did not challenge — much less refute — any of the ALJ's findings in that regard.

Aside from the ALJ finding no support for the opinions he rejected, opinions on certain issues, such as a claimant's RFC and whether a claimant is disabled, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 416.927(d). *See* SSR 96-5p; *Adams v. Comm'r, Soc. Sec. Admin.*, No. 14-11231, 2014 WL 4922215, at *2 (11th Cir. Oct. 2, 2014); *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 87, 877-78 (11th Cir. 2013); *Bell v. Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986). Opinions reserved to the Commissioner, even when offered by a treating physician, are not entitled to controlling weight or special significance. *See* SSR 96-5p. "Giving controlling weight to such opinions . . . would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Id.* Although a physician's opinions about what a claimant can still do or the claimant's restrictions may be relevant, such opinions are not determinative because the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. §§ 416.912(b)(2), 416.927(d)(2), 416.945(a)(3)**,** 416.946(c); SSR 96-5p; *see also Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 486 (11th Cir. 2012) ("A claimant's [RFC] is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive.").

The ALJ's decision to give greatest weight to Dr. Hutson's opinions was based on the fact Dr. Huston "is [a board certified] orthopedic specialist who had the benefit of reviewing the overall record of evidence in these proceedings" and "offered a cogent medical rationale and record support for his stated findings, which the [ALJ found] to be consistent with the credible record evidence in its entirety." T. 27. Dr. Hutson testified he reviewed the medical exhibits up to the date last insured. T. 3059. Based on his review, Dr. Hutson concluded plaintiff had degenerative disc disease of the cervical and lumbar spine; he accordingly imposed a number of restrictions. T. 3062-63. He explained his reasoning for disagreeing with the opinions of plaintiff's treating physicians, which included a lack of supporting evidence in the record. T. 3070-73. He concluded Mr. Mitchell is capable of sedentary work and adequately explained the bases of his decision. T. 3064-65. In short, the ALJ's decision to assign greatest weight to Dr. Hutson's opinion is supported by substantial evidence in the record.

## CONCLUSION

For the reasons set forth above, the undersigned finds the Commissioner failed to provide an adequate basis for his decision to afford less than great weight to the VA disability rating, a decision which may have impacted his determination of the combined effect of plaintiff's impairments. The matter thus should be remanded for

further consideration of the VA disability rating and the combined effect of plaintiff's impairments.[15]

Accordingly, it is respectfully RECOMMENDED:

1.  That the Commissioner's decision be set aside and the matter remanded for further consideration of the VA disability rating and the combined effect of plaintiff's impairments.

2.  That the clerk be directed to close the file.

At Pensacola, Florida this 9th day of August, 2017.


*/s/* *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being a served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon the Magistrate Judge and all other parties. A party failing to object a Magistrate Judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* U.S. Ct. of App. 11th Cir. Rule 3-1; 28 U.S.C. § 636.

---

[15] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).